**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 20 2013, 5:58 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JENNIFER A. JOAS**
Joas & Stotts
Madison, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**AARON J. SPOLARICH**
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIIP OF: Q.M. and E.M., Minor Children, | ) ) ) ) | |
| B.M., Father, | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 15A04-1303-JT-142 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause Nos. 15C01-1209-JT-23, 15C01-1209-JT-24

**December 20, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

B.M. (Father)[1] appeals the involuntary termination of his parental rights to his children, Q.M. and E.M. (Children). Father's parental rights had previously been terminated, but we reversed that order on September 11, 2012. *In Re Q.M.*, 974 N.E.2d 1021 (Ind. Ct. App. 2012). Soon afterward[2] the Dearborn County office of the Department of Child Services ("DCDCS") filed a second petition, which the trial court granted. Father argues on appeal:

1. DCDCS violated Father's right to due process because it did not provide Father with additional services between our reversal of the first termination order and the filing of the second termination petition;

2. The trial court committed fundamental error when it proceeded to a second termination hearing based on DCDCS's prematurely-filed second petition; and

3. There was insufficient evidence to support the involuntary termination of Father's parental rights.

We affirm.[3]

## FACTS AND PROCEDURAL HISTORY

The facts of the underlying CHINS adjudications and the earlier proceedings were set forth in our earlier opinion:

Father is the biological father of Q.M., born in July 2007, and E.M., born in August 2009. The facts most favorable to the trial court's judgment

---

[1] Mother voluntarily relinquished her parental rights to the Children.
[2] The petition is dated September 17 and the court, in its final order, indicates the petition was filed on that day. However, the Chronological Case Summary and the handwritten notation on the petition in the Appendix indicates the petition was filed on September 24.
[3] We held oral argument on this matter on November 19, 2013, at the Indiana Statehouse. We commend counsel on their advocacy.

2

reveal that the local Dearborn County office of the Indiana Department of Child Services ("DCDCS") became involved with this family in March 2010 after receiving a report of injuries suffered by then two-year-old Q.M. Although Q.M. had been taken to Dearborn County Hospital by his mother for uncontrollable vomiting, hospital personnel noticed Q.M. had sustained multiple injuries including a bruise to the tip of his penis, bilateral bruising on both hips, small bruises on his face, and a laceration to his chin. Q.M. was transported to Cincinnati Children's Hospital where it was further discovered that Q.M. also had suffered damage to his small intestine requiring surgery to remove a portion of the injured organ.

While Q.M. remained at Cincinnati Children's Hospital, Dr. Shapiro, Medical Director of the hospital's Child Abuse Team, informed the DCDCS assessment case manager that Q.M.'s injuries, including the injury to his small intestine, were indications of abuse. Dr. Shapiro further disclosed that the injury to Q.M.'s small intestine was a result of "blunt force trauma" that could have been caused by "a punch or a kick." Appellant's Appendix at 50.

As a result of its investigation, DCDCS filed petitions, under separate cause numbers, seeking emergency custody of both Q.M. and E.M. The emergency custody petitions were granted, and DCDCS thereafter filed petitions alleging Q.M. and E.M. were children in need of services ("CHINS"). Although the specific perpetrator of Q.M.'s injuries was never specifically identified, Father later signed a Stipulation of CHINS agreement wherein he acknowledged that Q.M.'s injuries "would not have occurred but for the act or omission of a parent, custodian, or guardian." *Id.* at 89.

The children were adjudicated CHINS, and the trial court entered an order directing Father to participate in various services including a psychological evaluation, parenting classes, individual counseling, and therapeutic visits with the children. Initially, Father participated in several of these court-ordered services. He failed, however, to progress in his ability to incorporate the things he was learning into his daily life and interactions with the children. For example, Father's evaluation with psychologist Dr. Edward Connor indicated Father consistently tried to present a more positive persona than what reality would indicate. Father also demonstrated a deficit in his ability to be "emotionally attuned" to the children, which was "particularly concerning" with regard to Q.M., who had suffered such "severe emotional trauma." Transcript at 121. Additionally, Father did not express his emotions in a positive manner and had significant passive-aggressive tendencies. As a result of his evaluation, Dr. Connor recommended Father participate in individual counseling.

Although Father initially participated in the recommended individual therapy through Lifeworks Counseling, he failed to successfully complete the program. Moreover, the therapist working with Father observed that Father's

"thoughts" and "perceptions" were "distorted" to such a degree that it rendered him incapable of being "effective in any level of interaction with his children." *Id*. at 23. Father also began expressing obsessive and aggressive behaviors with regard to Mother following the couple's break-up in October 2010. This extreme and obsessive behavior by Father was observed by service providers during visits with the children and during other interactions with case workers and service providers. For example, Father sent 96 text messages and made numerous phone calls concerning Mother and her whereabouts to the home-based counselor's personal cell phone and home phone during a single weekend, causing the provider to feel threatened and to request no further work with Father.

Father also began showing up at the DCDCS office whenever he thought Mother might be there, and a restraining order was later issued against Father with regard to [Mother]. Father was also ordered by the trial court to limit his contact with certain DCDCS case managers and service providers due to his unstable behavior and aggressive telephone calls and texts. Because Father's behavior was viewed as a threat to the children, Father's visitation privileges were also eventually limited.

As a result of Father's overall lack of progress in services, refusal to accept responsibility for his role in the children's removal, and inability to understand the severe emotional trauma suffered by Q.M. and/or effectively deal with the child's long-term emotional and behavioral issues, DCDCS filed petitions seeking the involuntary termination of Father's parental rights to both children on May 20, 2011. Although the children had been removed from the family home for approximately thirteen months, no dispositional order formally removing the children from Father's care and custody had been issued by the trial court at the time the termination petitions were filed. Upon discovering this oversight, DCDCS sought, and the trial court entered, dispositional orders formally removing the children from Father's care and custody in July 2011.

A consolidated, two-day evidentiary hearing on the termination petitions as to both children commenced in August 2011 and later concluded in October 2011. During the hearing, DCDCS presented considerable evidence regarding Father's failure to successfully complete a majority of the court-ordered reunification services, including individual counseling and a Batterer's Intervention [P]rogram. The evidence also confirmed Father remained unable to demonstrate that he was capable of providing the children with a safe and stable home environment. Specifically, DCDCS presented substantial evidence establishing Father's ongoing distorted self-perceptions, lack of emotional attunement with the children, refusal to acknowledge the significance of Q.M.'s physical and emotional trauma, and ongoing obsession with Mother.

4

As for the children, DCDCS submitted evidence showing Q.M., who was diagnosed with post traumatic stress disorder, intermittent explosive disorder, and oppositional defiant disorder, was living and thriving together with E.M. in the care of his pre-adoptive foster family. Additional evidence established that Q.M.'s significant behavioral and emotional outbursts were lessening, and that the child was happy, trusted, and bonded to his foster parents, especially his foster mother who had become Q.M.'s primary source of emotional security.

At the close of evidence, the trial court took the matter under advisement. On November 7, 2011, the trial court issued its judgment terminating Father's parental rights to Q.M. and E.M.

*In re Q.M.*, 974 N.E.2d at 1022-24.

On appeal, DCDCS conceded it had not filed its dispositional decree removing the Children from Father's home until after it had filed the petition for termination and that the Children had been removed from Father's home for only thirteen of the required fifteen months. Thus, DCDCS's termination petition had not satisfied "the jurisdictional requirements of Indiana Code § 31-35-2-4(B)(2)(a)." *Id.* at 1024. We, therefore, reversed the involuntary termination of Father's parental rights to the Children and remanded. Our opinion was handed down on September 11, 2012.

Within two weeks DCDCS filed a second petition to involuntarily terminate Father's parental rights. The trial court held a hearing December 18 and thereafter issued another order involuntarily terminating Father's parental rights.[4]

---

[4] The court entered the order terminating Father's rights on January 14, 2013. However, Father claimed he did not receive a copy of that order, and the Chronological Case Summary suggested that order may not have been sent to him. To provide Father with an opportunity to appeal, the trial court entered an amended order that contained the same findings, conclusions, and judgment as the original order.

5

**DISCUSSION AND DECISION**

1.      Additional Services after Reversal of First Termination Order

In a termination of parental rights proceeding, parents have certain due process rights:

> When a State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." *E.P. v. Marion County Office of Family & Children*, 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) (quoting *Lassiter v. Dep't of Social Servs*., 452 U.S. 18, 26, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). *Citing Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), this court has recently acknowledged that the nature of the process due in parental rights termination proceedings turns on a balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter County Office of Family and Children*, 734 N.E.2d 1107 (Ind. Ct. App. 2000)[, *reh'g denied*].

*J.T. v. Marion Co. Office of Family & Children*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), *reh'g denied*, *trans. denied*, *abrogated on other grounds by Baker v. Marion Co. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004). In addition*,* "procedural irregularities in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *A.P.*, 734 N.E.2d at 1112-13.

Father argues his due process rights were violated when DCDCS did not provide services to Father or attempt to reunify him with his Children between our reversal of the first termination order and DCDCS's filing of the second termination petition. Father argues that, on remand, DCDCS was required to offer reunification services pursuant to Ind. Code §

6

31-34-21-5.5(b) (footnote added):

> (b) Except as provided in section 5.6[5] of this chapter, the department shall make reasonable efforts to preserve and reunify families as follows:
> > (1) If a child has not been removed from the child's home, to prevent or eliminate the need for removing the child from the child's home.
> > (2) If a child has been removed from the child's home, to make it possible for the child to return safely to the child's home as soon as possible.

In addition, Father argues the short time before the second termination petition – within two weeks of our uncertified opinion – deprived him of the due process required before involuntary termination.

DCDCS was not required to provide Father with services because he did not request them. *See In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) ("a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting"). Regarding this issue, the trial court found:

> [Family Case Manager] Eckstein testified that she spoke multiple times with Father on the phone after the [C]ourt of Appeals reversed the termination of parental rights. In none of these conversations did Father ask FCM Eckstein about the [C]hildren and how the [C]hildren were doing or whether he could visit the [C]hildren.

(App. at 44.) During the hearing on the second termination petition, DCDCS Case Manager Amy Eckstein testified:

> [State]: . . . [W]hat is the reason that any services for [Father] did not begin again?
> [Eckstein]: We had - the case had been open to - since 2010 and he did not progress in those services or complete those services and the

---

[5] Ind. Code § 31-34-21-5.6 lists scenarios – including a parent's conviction of certain crimes, prior termination proceedings, and abandonment of an infant – during which DCDCS is not required to comply with Ind. Code § 31-34-21-5.5. Neither party asserts one of those scenarios occurred in the instant case.

>                   Department [of Child Services] did not feel that he would progress in
>                   any future services?
>
> [State]:        Did [Father] motion the Court to request any services to begin again?
> [Eckstein]:   Not to my knowledge.

(Tr. at 12.)  Father also testified:

> [Father's Counsel]:  OK.  Now, at some point you heard that the [first termination]
>                             case was overturned by an appeal, correct?
> [Father]:                 Yes.
> [Father's Counsel]:  When you learned that the case was overturned on appeal, did
>                             you make any efforts to try to resume visitations and contact
>                             with your children?
> [Father]:                 No Sir I have not.

(*Id*. at 18.)  Father then testified regarding his frustration with various parts of the CHINS process and his disagreements with service providers, but never testified that he asked for reunification services after we reversed the first termination order.  Therefore, Father has not demonstrated his due process rights were violated when DCDCS did not provide him with reunification services and DCDCS was not required to in the absence of his request to do so.

2.      Premature Filing of Second Termination Petition

Our Appellate Rules provide: "The trial court, Administrative Agency, and parties *shall not* take any action in reliance upon the opinion or memorandum decision until the opinion or memorandum decision is certified." App. R. 65(E) (emphasis added).  An opinion is certified "only after the time for all Petitions for Rehearing, Transfer, or Review has expired, unless all the parties request earlier certification. If the Supreme Court grants transfer or review, the Clerk shall not certify any opinion or memorandum decision until final disposition by the Supreme Court." *Id*.  A party must file a petition for rehearing or transfer

8

no later than thirty days after the decision. App. R. 54 (B) (rehearing); App. R. 57(C)(1) (transfer). Our Indiana Supreme Court recently upheld a trial court's refusal to act on a party's request for implementation of an appellate holding prior to its certification. *Founds. of E. Chicago, Inc. v. City of E. Chicago*, 933 N.E.2d 874, 874-5 (Ind. 2010).

Our opinion reversing the first termination order was issued on September 11, 2012, and DCDCS filed its new petition on either September 17 or September 24. *See supra* at 1 n.3. The filing therefore occurred before the thirty-day time frame for a petition for rehearing or for transfer had passed. Regarding that premature filing, the trial court found:

> 22. [DCDCS] did not begin visits after the Court of Appeals reversed the original TPR [termination of parental rights]. It is noted that [DCDCS] re-filed a TPR petition within six (6) days of receiving the Court of [A]ppeals order. FCM Eckstein acknowledged, however, that [DCDCS] spoke with [Q.M.'s] counselor about doing visits and the counselor and DCS believed that visits would be detrimental to the child. The child's behavior has begun to stabilize since the original TPR due to the care he has received. FCM Eckstein believes, and the Court finds, that the child's behavior would destabilize if visits began again with his father.

(App. at 43-44.) At oral argument, DCDCS conceded the second termination petition was filed prematurely, but argued the error was harmless. We agree.

We will not reverse a trial court's decision on the basis of an "error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties" when that error's "probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." App. R. 66(A). DCDCS filed its second petition before our opinion was certified, but the trial court did not act on the petition until two weeks after certification. Father did not bring the issue of the premature filing to the

9

trial court's attention or file a motion to dismiss based on the error, which means this alleged error also was waived for appellate review. *See In re S.P.H. and H.P.H.*, 806 N.E.2d at 877-78 (failure to first raise an issue at the trial court level waives the issue from appellate consideration). As noted above, Father did not request services, so the premature filing did not affect his rights. While DCDCS's premature filing was error, we are unable to find prejudice when Father has not demonstrated any impact on the decision of the trial court. Therefore, the error was harmless. *See Rogers v. R.J. Reynolds Tobacco Co.*, 745 N.E.2d 793, 796 (trial court's procedural error was harmless when it did not ultimately affect the outcome of the case).

3.    Sufficiency of Evidence Supporting Termination

We review termination of parental rights with great deference. *In re K.S., D.S., and B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine first whether the evidence supports the

10

findings and second whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A juvenile court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id*. at 836.

To terminate a parent-child relationship, the State must allege and prove:

> (A) that one (1) of the following is true:
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> > (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty- two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

11

(B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

Father does not challenge the trial court's findings regarding Ind. Code § 31-35-2-4(B)(2)(A) and Ind. Code § 31-35-2-4(b)(2)(D). He disputes only the trial court's findings that there is a "reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of parents will not be remedied," Ind. Code § 31-35-2-4(b)(2)(B)(i), and "that termination is in the best interests of the child." Ind. Code § 31-35-2-4(b)(2)(C).

### a. Remedy of Conditions Resulting in Children's Removal

Regarding whether there was a reasonable probability the conditions that resulted in the Children's removal from their home would be remedied, [6] the trial court concluded: [7]

---

[6] Father also challenges the trial court's conclusion that the continuation of the parent-child relationship posed a threat to the well-being of the children pursuant to Ind. Code § 31-35-2-4(b)(4)(B)(ii). However, as Ind.

12

3. DCS has established by clear and convincing evidence that the reasons for continued placement outside the home will not be remedied. The Court particularly notes that:

    A. Father has failed to complete therapy and the Batterer's Intervention Program.

    B. Father has also failed to make considerable progress working with caseworkers from George Jr. Republic.[8]

    C. Father's distorted perceptions render him incapable of recognizing the necessity of change, and his passive-aggressive tendencies have undermined some of the work done with him.

    D. Father's obsession with his failed relationship with mother took precedence to concerns regarding the children – no progress was made as a result.

(App. at 46) (footnote added). The trial court noted fourteen findings of fact it relied on in

making its conclusion:

8. Father suffers from "distorted perceptions", [sic] according to Father's Lifeworks therapist, Janelle Batta, which render him incapable of seeing the negative sides of his actions.

9. In Father's counseling sessions, he focused obsessively on Mother and their relationship rather than on his own issues or on his children.

10. Father also displayed obsessive behavior with regard to Mother after their breakup in visits with his children and in his interactions with caseworkers and service providers.

11. Father's extreme behavior included questioning service providers and DCS staff about Mother's location, including sending nearly one hundred (100) text messages about Mother to service provider Jennifer Buesing on her personal cell phone, causing her to request no further work with [Father]. A restraining order was issued between Father and

Code § 31-35-2-4(B) is written in the disjunctive, DCDCS needed only prove one of the requirements. *See In re J.W.*, 779 N.E.2d 954, 962 (Ind. Ct. App. 2002) (DCS required to prove one, but not both, of the requirements set forth by Ind. Code § 31-35-2-4(B)).

[7] We note a majority of the trial court's findings focus on Q.M. and say little about E.M.'s situation. While we hold the evidence sufficient to terminate Father's rights to both children, we encourage the trial court, when determining the fate of two children, to present more thorough findings regarding both children.

[8] "George Junior Republic in Indiana provides a continuum of services including home-based therapeutic services, group homes, and independent living across the state of Indiana. GJR Home-Based includes services that are provided to families and children in their own homes, schools and communities. These services range from home-based casework and therapy, functional family therapy, independent living, supervised visitations and homemaker services." http://georgejuniorrepublic.org/gjr_in_indiana.html (last accessed November 27, 2013).

13

Mother, and Father appeared at the DCS office at times where he thought he could run into Mother. The result of this conduct was an order from the Court limiting Father's contact with DCS and service providers and likewise limiting his visitation, as his unstable behavior was a threat to the children.

12. Father demonstrated neither aptitude for nor any progress in gaining emotional attunement with his children, according to testimony from Batta and George Jr. Republic workers Jon MacMurdo and Jennifer Buesing.

13[.] Father's deficit in emotional attunement was noted by Dr. Connor in his psychological evaluation of Father.

14. Father was referred to the Batterer's Intervention program at Lifeworks but failed to recognize any need for the service and did not engage in it or successfully complete this service.

15. Father continued to blame Mother for the issues that resulted in continued placement outside the home and continued to call DCS staff to complain about Mother's behavior up to the date of the original termination hearing. He testified about Mother's employment as an exotic dancer and her cheating against [sic] [F]ather to cause the breakup of their marriage. While these facts are not desirable, they did not make Mother responsible for Father's unwillingness to engage in the services he was offered. It is Father's obligation to be a fit parent, and Father's obligation to do what is necessary in the CHINS case to repair his parenting deficits. Father's consistent blame shifting corresponds to the distorted perceptions noted by Batta and the tendency to present himself in the best possible light as noted by Dr. Connor.

16. Services for Father were stopped at the filing of the first termination of parental rights petition in February, 2011; as Father's rights remained terminated throughout the appeal, no services were offered during the appeal process. Services were not reinstated after the Court of Appeals reversed the original petition. FCM Eckstein believed that Father showed an inability to progress from the services previously provided and that he had showed no changes such that services would now help him progress.

17. Consistent with FCM Eckstein's testimony, despite services offered, [F]ather remained unable to understand the severe trauma suffered by [Q.M.]. This inability renders Father incapable of dealing with the long term issues [Q.M.] continues to suffer with regard to his injuries.

18. Father's visitation was always supervised, usually for one or two hours at a time twice a week. These visits took place prior to the original termination of parental rights petition.

19. Father made little progress in attuning to the children in visits and no service provider ever recommended an increase in visitation.

20. Father refused to visit his children for a two (2) or three (3) week period in March and April, 2011, because DCS required these visits to be at the DCS office instead of in the community.

21. Father's refusal to visit indicates self-centered tendencies which appear to govern Father's behavior throughout the case. The Court finds that this was shown by his refusal to participate in Batterer's Intervention because he didn't feel he needed the program and his failure to successfully complete counseling with Janelle Batta because he felt she was not a good therapist. Father's priorities are thus centered on his own needs to the exclusion of his children's needs. DCS should not be required to incentivize parents to make them want to visit their children.

(*Id*. at 41-43.)

To determine whether there is a reasonable probability the conditions justifying a child's continued placement outside the home will not be remedied, "the trial court must judge a parent's fitness to care for her children at the time of the termination and take into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied sub nom. Timm v. Office of Family & Children*, 753 N.E.2d 12 (Ind. 2001). Nevertheless, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. The court may consider the parent's response to services offered by an Office of Family and Children when determining whether conditions have changed. *M.B. v. Delaware Cnty. Dept. of Welfare*, 570 N.E.2d 78, 82 (Ind. Ct. App. 1991). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.

15

*A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. A trial court need not wait until a child is irreversibly harmed by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).

Father argues DCDCS did not present evidence reflecting his fitness and ability to care for his Children at the time of the second termination hearing; instead, he asserts DCDCS relied "almost solely," (Br. of Appellant at 19), on evidence presented during the first termination hearing. However, during the second termination hearing, Father's counsel said, "the facts [sic] situation hasn't changed at all since that prior termination hearing," (Tr. at 13-14), and counsel agreed to the incorporation of the transcript and record from the first termination hearing. Father testified that he would not "do anything" to change his testimony during the prior termination hearing. (*Id.* at 18.) Thus, to the extent the trial court's decision was based on the evidence from the first hearing, Father and his counsel invited any error therein. *See Witte v. Mundy ex rel. Mundy*, 820 N.E.2d 128, 133 (Ind. 2005) ("party may not take advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct.").

Further, there was sufficient evidence to support the trial court's findings. During the second termination hearing, the DCDCS case manager, Amy Eckstein, testified:

> [Father] did not progress in his services, he was unable to address the family situations that had led to the removal of the [C]hildren and he - and throughout the case he did not put the [C]hildren first. At one point of time in March of 2011 and April of 2011 he refused to visit the [C]hildren because he did not

16

want to visit in an 8 by 8 room. And he was unable to put the [C]hildren first. [He] [w]as unable to understand [Q.M.'s] diagnosis and would not be able to help the [C]hildren.

(Tr. at 13.) During the first termination hearing, Father's counselor testified he did not make any progress in therapy designed to "work on his parenting deficits, emotional attunement with his [C]hildren[.]" (DCDCS Ex. 1, page 15.) Dr. Edward Connor, who conducted Father's psychological evaluations testified Father's emotional attunement was important considering the trauma Q.M. experienced which led to the DCDCS involvement. Additionally, Father never progressed beyond supervised visitation with the Children because he "missed visitation," would "not visit with the [C]hildren" and instead would "speak about the case and speak about [Mother] during these visits[.]" (*Id*. at 159.)

DCDCS presented sufficient evidence to prove the conditions under which the Children were removed from Father's home would not be remedied. Father's arguments to the contrary are invitations for us to reweigh the evidence, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses).

### b. Best Interests of the Children

Pursuant to Ind. Code § 31-35-2-4(b)(1)(C), DCDCS needed to provide sufficient evidence "that termination is in the best interests of the child." In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In so doing, the trial court must subordinate the interests of the parent to those

17

of the child. *Id.* The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* Recommendations of the case manager and court-appointed advocate, in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.*

> Regarding the best interests of the Children, the trial court concluded:
>
> [DC]DCS has established by clear and convincing evidence that termination of the parent-child relationship is in the best interests of the child. Both FCM Eckstein and GAL Cleary testified in support of termination, and Father has done little to alleviate the conditions that resulted in continued placement outside the home. There is no evidence to suggest Father can provide the stability and nurturing needed by his children. The children are in a stable, appropriate, and well-kept home with foster parents, and permanency is essential for these children.

(App. at 47.)

Father argues DCDCS did not present sufficient evidence because "[a] subjective finding that there was a lack of progress despite participation in services does not demonstrate clear and convincing evidence." (Br. of Appellant at 24.) He argues he completed the required services and he is not to blame for DCDCS's failure to accommodate his request for a new therapist. Father also contends his supervised visits should not have been terminated based on "verbal behavior not directed at the children or occurring in the children's presence, but at service providers." (*Id.*)

As noted above, the evidence presented indicated Father's supervised visits were terminated because he did not visit with the Children when given the time to do so, and did

18

not focus on the Children during visits. In addition, Father did not progress in therapy, specifically in the areas of proper parenting techniques and emotional attunement to the Children.

DCDCS presented sufficient evidence the involuntary termination of Father's parental rights was in the best interests of the children. Father's arguments to the contrary are invitations for us to reweigh the evidence, which we cannot do. *See In re D.D*., 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses).

## CONCLUSION

DCDCS was not required to offer services because Father did not request them. Any error from the consideration of DCDCS's prematurely filed second termination petition was harmless because the violation of the Appellate Rules did not prejudice Father or affect the outcome of the case. Finally, DCDCS presented sufficient evidence that involuntary termination of Father's parental rights to the Children was warranted based on evidence that the conditions under which the Children were removed would not be remedied, and that termination was in the best interests of the Children. Accordingly, we affirm the decision of the trial court.

Affirmed.

BAILEY, J., and BRADFORD, J., concur.

19