# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JEFFREY E. STRATMAN**
Aurora, Indiana

ATTORNEYS FOR APPELLEE:

**MATTHEW K. HAGENBUSH**
DCS, Local Office in Dearborn County
Lawrenceburg, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Sep 11 2012, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: Q.M. and E.M., Minor Children, <br><br> B.M., Father, <br><br>     Appellant-Respondent, <br><br>           vs. <br><br> INDIANA DEPARTMENT OF CHILD SEVICES, <br><br>     Appellee-Petitioner. | No. 15A05-1112-JT-706 |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause Nos. 15C01-1105-JT-12, 15C01-1105-JT-13

**September 11, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

B.M. ("Father") appeals the involuntary termination of his parental rights to his children, Q.M. and E.M.    Concluding that the Indiana Department of Child Services failed to establish the requirements of Ind. Code § 31-35-2-4(b)(2)(A), we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

**Facts and Procedural History**

Father is the biological father of Q.M., born in July 2007, and E.M., born in August 2009.[1]  The facts most favorable to the trial court's judgment reveal that the local Dearborn County office of the Indiana Department of Child Services ("DCDCS") became involved with this family in March 2010 after receiving a report of injuries suffered by then two-year-old Q.M.  Although Q.M. had been taken to Dearborn County Hospital by his mother for uncontrollable vomiting, hospital personnel noticed Q.M. had sustained multiple injuries including a bruise to the tip of his penis, bilateral bruising on both hips, small bruises on his face, and a laceration to his chin.  Q.M. was transported to Cincinnati Children's Hospital where it was further discovered that Q.M. also had suffered damage to his small intestine requiring surgery to remove a portion of the injured organ.

While Q.M. remained at Cincinnati Children's Hospital, Dr. Shapiro, Medical Director of the hospital's Child Abuse Team, informed the DCDCS assessment case manager that Q.M.'s injuries, including the injury to his small intestine, were indications of abuse.  Dr. Shapiro further disclosed that the injury to Q.M.'s small intestine was a

_____

[1] The children's biological mother, A.M., signed voluntary consents for the adoption of Q.M. and E.M. and does not participate in this appeal.  Consequently, we limit our recitation of the facts to those pertinent solely to Father's appeal.  A.M.'s voluntary relinquishment of her parental rights to the children remains unaffected by this opinion.

result of "blunt force trauma" that could have been caused by "a punch or a kick." Appellant's Appendix at 50.

As a result of its investigation, DCDCS filed petitions, under separate cause numbers, seeking emergency custody of both Q.M. and E.M. The emergency custody petitions were granted, and DCDCS thereafter filed petitions alleging Q.M. and E.M. were children in need of services ("CHINS"). Although the specific perpetrator of Q.M.'s injuries was never specifically identified, Father later signed a Stipulation of CHINS agreement wherein he acknowledged that Q.M.'s injuries "would not have occurred but for the act or omission of a parent, custodian, or guardian." Id. at 89.

The children were adjudicated CHINS, and the trial court entered an order directing Father to participate in various services including a psychological evaluation, parenting classes, individual counseling, and therapeutic visits with the children. Initially, Father participated in several of these court-ordered services. He failed, however, to progress in his ability to incorporate the things he was learning into his daily life and interactions with the children. For example, Father's evaluation with psychologist Dr. Edward Connor indicated Father consistently tried to present a more positive persona than what reality would indicate. Father also demonstrated a deficit in his ability to be "emotionally attuned" to the children, which was "particularly concerning" with regard to Q.M., who had suffered such "severe emotional trauma." Transcript at 121. Additionally, Father did not express his emotions in a positive manner and had significant passive-aggressive tendencies. As a result of his evaluation, Dr. Connor recommended Father participate in individual counseling.

3

Although Father initially participated in the recommended individual therapy through Lifeworks Counseling, he failed to successfully complete the program. Moreover, the therapist working with Father observed that Father's "thoughts" and "perceptions" were "distorted" to such a degree that it rendered him incapable of being "effective in any level of interaction with his children." Id. at 23. Father also began expressing obsessive and aggressive behaviors with regard to Mother following the couple's break-up in October 2010. This extreme and obsessive behavior by Father was observed by service providers during visits with the children and during other interactions with case workers and service providers. For example, Father sent 96 text messages and made numerous phone calls concerning Mother and her whereabouts to the home-based counselor's personal cell phone and home phone during a single weekend, causing the provider to feel threatened and to request no further work with Father.

Father also began showing up at the DCDCS office whenever he thought Mother might be there, and a restraining order was later issued against Father with regard to the children's mother. Father was also ordered by the trial court to limit his contact with certain DCDCS case managers and service providers due to his unstable behavior and aggressive telephone calls and texts. Because Father's behavior was viewed as a threat to the children, Father's visitation privileges were also eventually limited.

As a result of Father's overall lack of progress in services, refusal to accept responsibility for his role in the children's removal, and inability to understand the severe emotional trauma suffered by Q.M. and/or effectively deal with the child's long-term emotional and behavioral issues, DCDCS filed petitions seeking the involuntary

4

termination of Father's parental rights to both children on May 20, 2011. Although the children had been removed from the family home for approximately thirteen months, no dispositional order formally removing the children from Father's care and custody had been issued by the trial court at the time the termination petitions were filed. Upon discovering this oversight, DCDCS sought, and the trial court entered, dispositional orders formally removing the children from Father's care and custody in July 2011.

A consolidated, two-day evidentiary hearing on the termination petitions as to both children commenced in August 2011 and later concluded in October 2011. During the hearing, DCDCS presented considerable evidence regarding Father's failure to successfully complete a majority of the court-ordered reunification services, including individual counseling and a Batterer's Intervention program. The evidence also confirmed Father remained unable to demonstrate that he was capable of providing the children with a safe and stable home environment. Specifically, DCDCS presented substantial evidence establishing Father's ongoing distorted self-perceptions, lack of emotional attunement with the children, refusal to acknowledge the significance of Q.M.'s physical and emotional trauma, and ongoing obsession with Mother.

As for the children, DCDCS submitted evidence showing Q.M., who was diagnosed with post traumatic stress disorder, intermittent explosive disorder, and oppositional defiant disorder, was living and thriving together with E.M. in the care of his pre-adoptive foster family. Additional evidence established that Q.M.'s significant behavioral and emotional outbursts were lessening, and that the child was happy, trusted,

and bonded to his foster parents, especially his foster mother who had become Q.M.'s primary source of emotional security.

At the close of evidence, the trial court took the matter under advisement. On November 7, 2011, the trial court issued its judgment terminating Father's parental rights to Q.M. and E.M. Father now appeals.

**Discussion and Decision**

Before parental rights may be involuntarily terminated, the State must allege and prove, by clear and convincing evidence, each element contained in Ind. Code § 31-35-2-4(b). In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009); see also Ind. Code § 31-37-14-2. Subsection (b)(2)(A) of Indiana's termination statute provides that an involuntary termination petition "must allege" that one of the following is true:

(i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)   A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required . . . .

(iii)  The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the last twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child[.]

Ind. Code § 31-35-2-4(b)(2)(A).[2] Because parents have a constitutionally protected right to establish a home and raise their children, see e.g. M.L.B. v. S.L.J., 519 U.S. 102, 116, 117 S. Ct. 555, 564 (1996), the Indiana Department of Child Services "must strictly

---

[2] We observe that Ind. Code § 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

comply with the statute terminating parental rights." Platz v. Elkhart Cnty. Dep't of Public Works, 631 N.E.2d 16, 18 (Ind. Ct. App. 1994); see also In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). Consequently, if the trial court "does not find that the allegations in the [termination] petition are true, the court *shall* dismiss the petition." Ind. Code § 31-35-2-8(b) (emphasis added); see also G.Y., 904 N.E.2d at 1261 (stating that if the State fails to prove any of the statutory elements in Ind. Code § 31-35-2-4(b)(2) then it is not entitled to a judgment terminating parental rights).

DCDCS acknowledges on appeal that it "did not file its dispositional decree until *after* it filed its termination petitions. . . ." Appellee's Brief at 7 (emphasis added). DCDCS further concedes that Q.M. and E.M. had been removed from the family home and placed under the supervision of DCDCS for only approximately thirteen, rather than the requisite fifteen, of the most recent twenty-two months when DCDCS filed its termination petitions. DCDCS therefore admits that it "did not satisfy the jurisdictional requirements of Indiana Code § 31-35-2-4(b)(2)(a)."[3] Id. A review of the record confirms DCDCS's admissions on appeal.

The "statutory mandate when seeking the involuntary termination of a parent-child relationship is 'clear and unequivocal.'" In re D.D., 962 N.E.2d 70, 74 (Ind. Ct. App. 2011) (citing Platz, 631 N.E.2d at 18). An involuntary termination petition must allege, and the State must prove by clear and convincing evidence, that the child was either removed from the parent for at least six months under a dispositional decree or removed from the family home at least fifteen of the most recent twenty-two months "at the time the involuntary termination petition was filed." D.D., 962 N.E.2d at 74; see also Ind.

---

[3] We commend DCDCS for its candor with this court.

Code § 31-35-2-4(b)(2)(A).  Based on the foregoing, it is clear that DCDCS failed to satisfy the mandates of Ind. Code § 31-35-2-4(b)(2)(A).  Thus, the trial court committed reversible error in granting DCDCS's involuntary termination petitions.[4]

As DCDCS alleged, but failed to prove removal of the children according to the dictates of Ind. Code § 31-35-2-4(b)(2)(A), the trial court's judgment terminating Father's parental rights to Q.M. and E.M. must be reversed, and this case remanded for further proceedings consistent with this opinion.

Reversed and remanded.

FRIEDLANDER, J., and PYLE, J., concur.

---

[4] Our decision today should not be construed as a negative comment upon the sufficiency of the evidence supporting the trial court's specific findings or ultimate decision to terminate Father's parental rights.  Moreover, in reaching this decision, we are keenly aware of the fact that both Q.M.'s and E.M.'s sense of permanency and well-being hangs in the balance.  Further delay in the final resolution of the children's cases is most certainly regrettable, but the Court is bound by statute to ensure the process.