

**FILED**

Sep 15 2016, 8:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Mark Small
Indianapolis, Indiana

Brian A. Karle
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.B. and V.G.,<br>*Appellants-Defendants,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Plaintiff.* | September 15, 2016<br><br>Court of Appeals Case No.<br>54A01-1603-JT-607<br><br>Appeal from the Montgomery Circuit Court<br><br>The Honorable Harry A. Siamas, Judge<br><br>Trial Court Cause No.<br>54C01-1510-JT-246,<br>54C01-1510-JT-247,<br>54C01-1510-JT-248,<br>54C01-1510-JT-249,<br>54C01-1510-JT-250 |

**Altice, Judge.**

**Case Summary**

[1] D.B. (Father) and V.G. (Mother) appeal following the involuntary termination of their parental rights. On appeal, they argue that the termination of their rights was improper because the termination petition was prematurely filed. Additionally, Father argues that the Department of Child Services (DCS) presented insufficient evidence to support the termination of his parental rights.

[2] We affirm.

## Facts & Procedural History[1]

[3] During the time relevant to this appeal, Mother and Father (collectively, the Parents) had two daughters together, Bi.B and Br.B. (collectively, the Girls), who were born in 2012 and 2013, respectively.[2] Mother also has three older sons, Ra.G., H.G., and Ru.G (collectively, the Boys), who were born in 2005, 2006, and 2008, respectively, from a previous relationship. The Boys' father is deceased.

[4] DCS became involved in April 2014 after receiving a report that the home was in poor condition, the Parents were using illegal drugs, and the Boys had been left at home alone. When law enforcement and a DCS investigator arrived at the home, they found Ra.G. and H.G., who were then eight and seven years

---

[1] Because Mother challenges only the timeliness of the termination petition, our recitation of the facts is largely limited to those relevant to Father's argument that DCS presented insufficient evidence to support the termination of his rights.

[2] While this case was pending, Mother gave birth to another child. That child is not a subject of these proceedings.

old, alone and without a working telephone. The investigator also discovered that the home was dirty, with trash and dirty dishes piled up and a mouse infestation. When the Parents returned home after receiving a phone call from the DCS investigator, Mother submitted to a drug screen and tested positive for methamphetamine. Father refused a drug screen but admitted to using marijuana three weeks earlier.

[5] As a result of these events, DCS filed petitions alleging that all five children (collectively, the Children) were Children in Need of Services (CHINS). On May 8, 2014, the Children were adjudicated CHINS following the Parents' admission to the allegations in the CHINS petitions. On June 6, 2014, the CHINS court issued its dispositional order, pursuant to which the Children were made wards of DCS but remained in the Parents' home. The court also ordered the Parents to participate in a number of services, including home-based case management, substance abuse treatment, and random drug screens.

[6] On July 14, 2014, DCS received a report that there had been an incident of domestic violence between the Parents. DCS Family Case Manager (FCM) Charlene Tolley made contact with Mother, who confirmed that the Parents had been in a physical altercation while the Children were present. Mother also admitted that she and Father had used methamphetamine together a few days earlier and had driven with the Children in the car less than an hour later. Father again refused to submit to a drug screen. In light of these developments, DCS removed the Children immediately. The Boys were placed in one foster home and the Girls in another. A detention hearing was held the next day, and

the CHINS court entered an order approving the Children's removal and continued placement in foster care. The Parents were subsequently ordered to participate in supervised visitation.

[7] The Parents' participation in reunification services was sporadic throughout the underlying CHINS proceedings. Father refused to submit to random drug screens for the first several months of the CHINS proceedings. Father eventually submitted to a total of thirty-five drug screens throughout the course of the underlying proceedings, twenty-three of which were positive for marijuana, methamphetamine, or both. Father was also referred for an eight-week intensive outpatient program (IOP) for substance abuse. Due to his poor attendance and failed drug screens, Father did not complete the program in the allotted time frame. Father completed IOP after receiving a one-month extension. Father was then referred to a relapse prevention program, and although he did not begin that program when he was originally supposed to, he did eventually complete the program. Despite completing treatment, he continued to test positive for marijuana and methamphetamine.

[8] The Parents were also referred for couple's counseling, but Father stopped attending after only two sessions. Father testified that he stopped going to couple's counseling because he "didn't want to go no more[.]" *Transcript* at 32. Father was also referred for individual therapy, but he did not attend a single session.

[9] The Parents' participation in home-based services was limited. According to home-based case manager Jamie Selby, the Parents refused to work on budgeting and "were reluctant or resistant to complying with services or recommendations." *Id.* at 59. Additionally, Father exhibited ongoing disrespectful behavior toward Selby. When she would attempt to redirect him, he would yell at her and tell her that she did not know how to do her job. Selby thought that Father might take better direction from a man, so she brought on a male case worker. Father made some limited progress for a few months until the male case worker was reassigned to another location and Father had to begin working with Selby again.

[10] During supervised visits, Parents struggled with engaging with the Children and imposing discipline. Additionally, Father exhibited disruptive behavior. For example, when a visit at a park was ended early due to inclement weather, Father became very loud and argumentative in the presence of the Children. On other occasions, visits were ended early because Mother and Father got into heated arguments and continued "to cuss and holler" in front of the Children after being told to stop. *Id.* at 66. Father fell asleep during a number of visits and at other times appeared to be under the influence. Additionally, the Parents sometimes failed to show up for visits at all, eventually resulting in the implementation of a policy requiring them to arrive for scheduled visits thirty minutes early in order to prevent the Children from being transported to the visitation facility only to find that the Parents were not there.

[11] On May 18, 2015, the CHINS court found that the Parents were not compliant with the case plan and changed the permanency plan to reunification with a concurrent plan of adoption. On September 23, 2015, the CHINS court changed the permanency plan to adoption only and relieved DCS of the obligation to provide services other than supervised visitation. DCS filed its termination petitions on October 9, 2015. An evidentiary hearing was held on March 9, 2016, and approximately one week later, the trial court entered its order terminating Mother's rights to all five of the Children and Father's rights to the Girls. This appeal ensued. Additional facts will be provided as necessary.

## Discussion & Decision

[12] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N .E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[13] The trial court entered findings in its order terminating the Parents' parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of*

*Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[14] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish parents, but to protect their children. *Id*.

## 1. Timeliness

[15] The Parents first argue that the termination of their parental rights was improper because the termination petition was prematurely filed. Ind. Code § 31-35-2-4(b)(2)(A) provides that a termination petition must allege that at least one of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child[.]

[16]     Although the evidence presented at the evidentiary hearing in this matter unequivocally established that the Children had been removed from the Parents under a dispositional decree for well over six months, the termination petitions regarding the Girls contained no allegation that subsection (i) had been satisfied.[3]  Instead, those petitions alleged only that the requirements of

---

[3] The termination petitions regarding Ra.G. and Ru.G. did contain allegations under subsection (i) that Ra.G. and Ru.G. had been removed for at least six months under a dispositional decree. *See Mother's Appendix* at 41, 45.  The trial court's finding that Ra.G. and Ru.G had been removed for at least six months is clearly supported by the record, and Mother makes no argument to the contrary.  Because the termination petition regarding H.G. does not appear anywhere in the record presented to us on appeal, any argument challenging the trial court's finding under subsection (i) with respect to H.G. has been waived. *See Ramsey v. Madison Cnty. Dep't of Family & Children*, 707 N.E.2d 814, 817-18 (Ind. Ct. App. 1999) (noting that "[o]n the points assigned as error, the appellant has the burden of presenting both a cogent argument and the appropriate portions of the record to establish the error[,]" and that an appellant who fails to do so waives consideration of those issues).  In any event, even if we assume that the termination petition for H.G. did not contain an allegation under subsection (i), our resolution of the timeliness issue with respect to the Girls would apply with equal force to H.G.  Accordingly, Mother is not entitled to reversal of the trial court's termination of her parental rights to the Boys.

subsections (ii) and (iii) had been met. It is undisputed, however, that subsection (ii) is inapplicable here. It therefore appears to us that DCS intended to make allegations under subsection (i) in the petitions regarding the Girls, but inadvertently made allegations under subsection (ii) instead.[4] Indeed, DCS argued at the evidentiary hearing that the requirements of subsections (i) and (iii) had been satisfied, with no mention of subsection (ii).

[17] Father argued below that DCS's failure to include an allegation under subsection (i) in its termination petitions regarding the Girls precluded the trial court from granting the petitions on that basis, and that the petitions were prematurely filed for the purposes of subsection (iii). Specifically, he noted that the Girls were removed from the home on July 14, 2014 and the termination petition was filed on October 9, 2015. Thus, the petition was filed five days short of the fifteen-month waiting period set forth in subsection (iii). The trial court entered findings that both subsection (i) and subsection (iii) had been satisfied with respect to all five of the Children.

[18] On appeal, both Parents reassert the timeliness arguments Father made below. DCS concedes that at the time the termination petitions were filed, the Girls had not yet been removed for 15 of the most recent 22 months as set forth in subsection (iii). In order for the petitions to have been timely filed under that

---

[4] This issue could have been avoided entirely if DCS had simply exercised adequate care and attention in drafting and filing its termination petitions in this matter. In the future, we urge DCS to proofread its filings with greater care.

subsection, they would have to have been filed five days later—on October 14, 2015 instead of October 9, 2014. Nevertheless, citing *In re J.W., Jr.*, 27 N.E.3d 1185 (Ind. Ct. App. 2015), *trans. denied*, DCS claims that this court has held that the requirements of subsection (iii) are satisfied so long as a child has been removed from a parent for fifteen of the most recent twenty-two months immediately preceding the termination hearing. Because the termination hearing in this case was not held until March 9, 2016, DCS argues that the fifteen-month requirement was satisfied. Father responds that *J.W.* is inapposite and that the outcome in this case is controlled by *In re Q.M.*, 974 N.E.2d 1021, 1025 (Ind. Ct. App. 2012), *trans. denied*, in which this court held that time requirements of I.C. § 31-35-2-4(b)(2)(A)(iii) must be satisfied at the time the termination petition is filed.

[19] We agree that DCS's reliance on *J.W.* is misplaced. In that case, the parents argued that the fifteen-month waiting period set forth in I.C. § 31-35-2-4(b)(2)(A)(iii) should be tolled during any period in which DCS fails to provide services to a parent. This court held that the statute simply requires DCS to demonstrate compliance with the statutory waiting period, with no requirement that DCS provides services to the parent during that time. In reaching this conclusion, the court reasoned that I.C. § 31-35-2-4(b)(2)(A)(iii) "is unambiguous and simply requires the DCS to demonstrate that a specific waiting period has occurred—namely, fifteen of the most recent twenty-two months *immediately prior to the termination hearing*—with a child removed from the parent." *J.W.*, 27 N.E.3d. at 1190 (emphasis supplied). We note, however,

that whether the children had been removed for fifteen of the most recent twenty-two months was not at issue in *J.W.* The only issue before the court was whether the fifteen-month waiting period should be tolled due to DCS's failure to provide services.

[20]  In *Q.M.*, on the other hand, this court was squarely presented with the issue we now confront—whether the children had been removed for fifteen of the most recent twenty-two months as required by I.C. § 31-35-2-4(b)(2)(A)(iii). This court held that "[a]n involuntary termination petition must allege, and the State must prove by clear and convincing evidence, that the child was . . . removed from the family home at least fifteen of the most recent twenty-two months '*at the time the involuntary termination petition was filed*.'" *Q.M.*, 974 N.E.2d at 1024-25 (quoting *In re D.D.*, 962 N.E.2d 70, 74 (Ind. Ct. App. 2011)) (emphasis supplied). Because the children in that case had been removed from the home for only approximately thirteen months at the time the termination petitions were filed, DCS conceded that it had not satisfied "the jurisdictional requirements" of I.C. § 31-35-2-4(b)(2)(A)(iii).[5]  *Id.* at 1024. Concluding that

---

[5] Our Supreme Court has noted a "tendency in procedural law to treat various kinds of serious procedural errors as defects in subject matter jurisdiction[.]" *In re Adoption of O.R.*, 16 N.E.3d 965, 970 (Ind. 2014) (quoting *K.S. v. State*, 849 N.E.2d 538, 541 (Ind. 2006)). "The question of subject matter jurisdiction entails a determination of whether a court has jurisdiction over the general class of actions to which a particular case belongs." *K.S.*, 849 N.E.2d at 542. There is no question that the court in this case has jurisdiction over proceedings to terminate parental rights. The issue presented here is therefore one of legal or procedural error, not subject matter jurisdiction.

DCS had not satisfied the requirements of I.C. § 31-35-2-4(b)(2)(A)(iii), this court reversed.

[21] Because this court directly addressed the issue of the date by which the fifteen-month requirement set forth in I.C. § 31-35-2-4(b)(2)(a)(iii) must be satisfied in *Q.M.*, we find that case controlling on that issue. As DCS filed its petitions to terminate the Parents' rights to the Girls on October 9, 2015—five days before the fifteen-month waiting period expired—its petition was premature and did not satisfy the requirements of the statute. This is so regardless of the fact that the Children had been removed for well over fifteen of the most recent twenty-two months by the time of the termination hearing.

[22] This does not, however, end our inquiry. The Parents have made no argument that they were prejudiced in any way by the premature filing. DCS was relieved of its obligation to provide services in the CHINS case and the permanency plan was changed to adoption on September 23, 2015—before the termination petitions were filed. Thus, the five-day-early filing had no effect on the provision of services to the Parents, and we are unaware of any other way they were harmed. It is well settled that this court will not reverse a trial court's judgment where the decision does not prejudice the substantial rights of a party. *See* Ind. App. Rule 66(A) (providing that "[n]o error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties"); Ind. Trial Rule 61 (providing that "[t]he court

at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties").

[23] Perhaps anticipating this response, Father cites *Q.M.* for the proposition that DCS must strictly comply with the termination statutes "[b]ecause parents have a constitutionally protected right to establish a home and raise their children[.]" 974 N.E.2d at 1024. We agree that failure to strictly comply with the termination statutes amounts to error, but this does not preclude application of the harmless error rule. Indeed, Indiana courts regularly apply harmless error analysis in cases involving the termination of parental rights and alleged violations of other important constitutional rights. *See In re the Involuntary Termination of Parent-Child Relationship of Kay.L.*, 867 N.E.2d 236, 241 (Ind. Ct. App. 2007) (applying harmless error analysis to a parent's argument that the termination petition did not contain all information required by statute); *see also Hernandez v. State*, 761 N.E.2d 845, 853 (Ind. 2002) (holding that "[a] denial of the right to be present during all critical stages of the proceedings, like the right to counsel at a critical stage, is a constitutional right that is subject to a harmless error analysis"); *Jackson v. State*, 735 N.E.2d 1146 (Ind. 2000) (finding a denial of the defendant's constitutional right of confrontation to be harmless). For the reasons set forth above, we conclude that any error resulting from the premature filing of the termination petitions was harmless, and the Parents are therefore not entitled to reversal on that basis.

## 2. Sufficiency of the Evidence

[24]    Next, Father argues that DCS presented insufficient evidence to support the termination of his parental rights to the Girls. In addition to the waiting period requirements discussed above, when DCS seeks to involuntarily terminate a parent's parental rights, it must allege and prove by clear and convincing evidence:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

I.C. § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[25]    Father challenges only the trial court's finding that I.C. § 31-35-2-4(b)(2)(B)(i) had been satisfied—i.e., that DCS had established by clear and convincing evidence a reasonable probability that the conditions resulting in the Girls' removal and placement outside the home will not be remedied. In making such a determination, the trial court must judge a parent's fitness to care for his or

her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In conducting this inquiry, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. Moreover, the failure to exercise visitation demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Lang*, 861 N.E.2d at 372 (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)) (alteration in original).

[26] In his brief, Father focuses solely on whether the conditions resulting in the Girls' initial removal have been remedied. However, the language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining

whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

[27] The trial court made the following relevant findings in support of its conclusion that there is a reasonable probability that the conditions resulting in the Girls' removal and continued placement outside the home will not be remedied:

> The children were removed from their parents in July 2014. The DCS has offered reunification services to both parents but neither parent was able to participate in these services in order to overcome their parenting deficits. [Father] has been particularly uncooperative and difficult. For many months he refused to participate in any services or take drug screens. His relationship with [Mother] is combative and sometimes violent. Neither parent did anything to protect the children from [the Parents'] toxic relationship. [Father] continued to abuse marijuana and methamphetamine. His visits with the children were inconsistent and he often ended the visits early. He has not visited with the [B]oys for two months at the time of the termination hearing and he has not visited more than twice with the [G]irls in the last two months. [Father] has made no progress and there is no reason to think that any services can be offered to him that would improve his poor parenting, substance abuse or domestic dysfunction.

*Father's Appendix* at 56.

[28] On appeal, Father argues that the problems in his relationship with Mother had been remedied because Mother and Father were in the process of separating. We acknowledge that Mother testified that she and Father were no longer romantically involved at the time of the termination hearing. Although they

were still living together, Mother testified that she was "moving out slowly." *Transcript* at 44. Mother testified that she had moved "four or five boxes" to her mother's house. *Id.* at 46. Mother acknowledged that she had said she was going to move out in the past, but never did so. When asked if he and Mother were going to continue living together, Father testified that he was "leaving it up to [Mother.]" *Id.* at 32. As our Supreme Court has noted, "[r]equiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Accordingly, the trial court was free to attribute greater weight to the Mother's pattern of not following through with her threats to leave than to her current claims that she was moving out. Moreover, the Parents failed to complete couple's counseling. After only two sessions, Father stopped attending because he "didn't want to go no more[.]" *Transcript* at 32. The trial court's finding that there was a reasonable probability that the Parents' combative and sometimes violent relationship would not be remedied is not clearly erroneous.

[29] With respect to his drug abuse, Father argues that the evidence presented on this point was "thin." *Father's Brief* at 11. Father acknowledges testimony that he submitted to a total of thirty-five drug screens throughout the course of the underlying proceedings, twenty-three of which were positive for marijuana, methamphetamine, or both. He notes further, however, that the positive drug screens were not admitted into evidence and argues that it is unclear when his last positive drug screens occurred and how many drug screens were positive for

marijuana only, which he calls "a much less destructive substance." *Id.* at 12. Father has not acknowledged that in its May 18, 2015 order changing the permanency plan from reunification to concurrent plans of reunification and adoption, the CHINS court found that Father had completed relapse prevention, but nevertheless "continues to test positive for marijuana." *Exhibit 2.* In its September 23, 2015 order changing the permanency plan to adoption only, the CHINS court found that Father "continues to use various substances, including THC and methamphetamine." *Id.* Moreover, Father admitted to FCM Tolley that he provided Mother with drugs in July 2015, and FCM Tolley testified at the termination hearing that Father was "still positive for drugs." *Transcript* at 159. This evidence was sufficient to support the trial court's finding that there was a reasonable probability that Father's drug use would not be remedied.

[30] The evidence presented at the termination hearing also supports the trial court's findings that Father did not visit with the Girls consistently, and when Father did show up for visits, his behavior was often inappropriate and disruptive. He got into loud verbal altercations with Mother and the visitation supervisor in the presence of the Children, he repeatedly fell asleep during visits, and sometimes appeared to be under the influence.

[31] In sum, Father has made no real progress toward addressing his parenting deficiencies. Accordingly, the trial court's finding that there is reasonable probability that the conditions resulting in the Girls' removal and continued

placement outside the home will not be remedied is amply supported by the evidence.

[32] Judgment affirmed.

[33] Bradford, J. and Pyle, J., concur.